UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                                        Case No. 3:14-cr-00199

        Plaintiff

   v.                                                                          ORDER

Edwin R. Kellogg, II,

        Defendant

      Pursuant to a plea agreement with the government, on March 19, 2015, Defendant pled guilty to Counts One, Two, Three, and Five of a six count superseding indictment, with Counts Four and Six to be dismissed at the time of sentencing. All four counts of conviction involve violations of 18 U.S.C. § 2251(a), Sexual Exploitation of Children, variously as to two minor victims. As is customary, the Defendant's case was then referred to the United States Pretrial and Probation Office for preparation of a Presentence Report. Neither the language of the indictment, the plea agreement, nor the stated factual basis for the plea alleged any improper touching by the Defendant against either of the victims, except as may have occurred incident to posing the victims during the taking of the illicit photographs at issue in the case.

      In the initial disclosure of the Presentence Report, there was no suggestion of any improper touching by the Defendant. In the course of the Probation Officer conducting her ongoing investigation, however, she discovered an allegation that there had in fact been accusations by both victims of improper touching by the Defendant, ostensibly within the timeframe contemplated in the indictment. Whether I find the Defendant improperly touched one or both of the victims matters in the calculation of the Defendant's advisory guideline range, specifically a two-point

enhancement pursuant to USSG § 2G2.1(b)(2)(A), my consideration of the nature and circumstances of the offenses in determining the appropriate sentence under relevant factors as set forth in 18 U.S.C. § 3553(a), and the possible appropriateness of a departure or variance if I find such contact did or did not exist.

As a result of this new information and its potential impact on sentencing, I conducted pretrial conferences with counsel for the both the government and defendant, mediated the exchange of documentation relevant to the allegations and examinations of the victims, and granted the defense request for expert assistance to review the allegations and records at issue. On February 8, 2016, I conducted an evidentiary hearing for counsel to present evidence and arguments regarding my ultimate determination on this issue. The Defendant called his expert, Jolie S. Brams, Ph.D. The government called two witnesses, crisis counselor Kelly Rupp from the Children's Advocacy Center in Toledo, Ohio, and Department of Homeland Security Forensic Interview Specialist Amy Allen. The government also offered, and I admitted without objection, Exhibits 1 and 2, records from Ms. Rupp's counseling sessions with both victims. Significantly, at the end of the hearing, I found the testimony of all three witnesses credible.

The first – and perhaps only – known allegation of improper touching by the Defendant is reflected in the documentation of the crisis counseling both victims received at the Children's Advocacy Center. But both children were first interviewed by Forensic Interview Specialist Allen. The sequence of events in the case is highly relevant, and goes to at least one of the primary objections the Defendant has interposed to the government's request that I find that improper touching occurred.

The four counts of conviction in the superseding indictment of this case allege conduct by the Defendant against both victims, variously, during an approximate time period from May through

2

August, 2009.[1] Ms. Allen's forensic interviews of both victims occurred in late March of 2010. Less than two weeks later, on April 5, 2010, both victims were first seen by crisis counselor Rupp, and made their allegations of improper touching by Mr. Kellogg.

      Ms. Allen is clearly a highly trained and experienced forensic interviewer. Both sides conceded as much. In fact, defense expert Jolie Brams commended her on the proper conduct of a forensic interview of both victims. During the course of those interviews, Ms. Allen asked a number of questions, including whether either victim was improperly touched by the Defendant. Significantly, neither victim made any disclosure of contact by the Defendant. Given the victims young ages and Ms. Allen's perception of at least one child's stress level, she did not repeat or press her question about improper touching, nor did she use any dolls or diagrams in conducting her interview.

      Ms. Rupp began her first counseling session on April 5, 2010, by having each child perform a number of exercises. Of relevance here is a standard matrix used in such counseling sessions, found on page 14 of government Exhibit 1, the counseling records of victim M.P. Entitled "Safe and Unsafe Touches", the worksheet has six boxes on the top half of the page, each labeled with a different type of touch: Hugging, Tickling, Spanking, Kissing, Hitting, and Touching "Where you go to potty." As Ms. Rupp described the exercise during her testimony, the child is asked to first characterize whether such touching is "safe" or "unsafe." The child is then asked, in essence, who would touch her in that way. With this victim, for example, she described tickling as "safe" and gave "Dad" as an example of who might touch her in that fashion.

      When asked about touching "Where you go potty", M.P. described and Ms. Rupp then labeled the touch as "unsafe" and gave "Uncle Ed" as an example, a reference to Defendant Edward

---

[1] Count Four of the superseding indictment, to be dismissed at sentencing, alleges conduct against one of the victims in September of 2009. While I may well consider conduct other than that in the counts of conviction for purposes of sentencing, Count Four does not change my analysis on this issue in any way. Count Six, also to be dismissed, involves allegations of distribution of images, and not conduct directly involving the Defendant's physical presence with either victim.

Kellogg. In addition, in response to encouragement by Ms. Rupp for M.P. to tell her more, she described his conduct against her as involving her "clothes off," the conduct happening in his bedroom and more than once, and him telling her not to tell anyone. She also characterized the Defendant as "mean and stupid" and that she was made to feel "creeped out, mad, and scared."

Ms. Rupp's progress notes from the first session, found on the back of page 12 of Exhibit 1, also reflect the victim's allegations that the Defendant took pictures of her posing and also "touched her where she goes potty," echoing the other comments noted on the touching survey completed by the victim and quoted above.

The second victim, A.P., participated in the same initial interview process as M.P., as described above. During the touching survey, she also reported "unsafe" touching by "Uncle Ed" "where she goes potty," but claims the touching occurred "on top of" her clothes while in the Defendant's living room. She asserted to Ms. Rupp that the Defendant made threats that he would get in trouble if she reported this activity, and said she was scared.[2] Ms. Rupp similarly notes these comments by the victim in her progress notes on the back side of page 12 of government's Exhibit 2.

I am confronted with two seemingly contradictory interviews for both victims. In the forensic interview conducted by Ms. Allen, both victims denied upon inquiry and upon being given an opportunity to report inappropriate touching by the Defendant, as asked by a highly skilled interviewer. Less than two weeks later, however, both victims alleged improper contact by the Defendant "where they go potty", in their first counseling sessions with Ms. Rupp.

The government urges me to discount the lack of disclosure with Ms. Allen, as it is not unusual for such victims to be reluctant to initially open up and disclose such abuse. I should accept the disclosures to Ms. Rupp, the government argues, because the method and means of their

---

[2] The touching survey for victim A.M. can be found in government's Exhibit 2, at page 14.

4

disclosure was appropriate and reliable, certainly reliable enough for me to conclude the government has sustained its burden by proof by a preponderance of the evidence.

Not so claims the defense. Both children had an opportunity in an appropriate setting to disclose any improper touching when asked by a skilled forensic interviewer and declined to do so. And, the defense asserts, the counseling session with Ms. Rupp is unreliable, as Ms. Rupp was conducting crisis counseling, not a forensic interview, and Ms. Rupp was inexperienced and unqualified to conduct such interviews. In particular, her methods and questioning were unduly suggestive so as to be unreliable enough for me to make a finding of credible allegations by both victims. And at any rate, the defense argues such an inconsistency between these two sessions, one a forensic interview and the other crisis counseling, ought to prohibit me making such a finding.

I will address the defense objections first. The lack of disclosure during the conduct of a proper forensic interview several months after the alleged abuse gives me great pause. Both parties are in ready agreement as to Ms. Allen's competency to conduct such interviews and both parties acknowledge her conduct of these particular two interviews was wholly proper under the circumstances. But both parties also acknowledge, through Dr. Brams for the defense and Ms. Allen for the prosecution, that it is not uncommon for victims of abuse, especially such young victims, to withhold disclosure of abuse, because they are not comfortable with the setting or interviewer, or both, or because they may feel fear, guilt, or some form of responsibility for withholding disclosure, or some combination of all of these things. So while the lack of initial disclosure gives me pause, it is not fatal to the government's argument.

The defense also expresses concern about the way in which disclosure was effected less than two weeks later. Dr. Brams properly expressed a number of concerns about the absence of a proper forensic interview during the disclosures. She also commented about a number of related concerns surrounding the timing and setting of the interview. Her opinions based upon her expertise were instructive and useful. Many of these concerns, however, were based upon a lack of

5

information made available to Dr. Brams at the time of her testimony or details not contained in the counseling file.  Most of those gaps were filled and concerns were addressed by Ms. Rupp in her hearing testimony.  It is true that Ms. Rupp was very inexperienced in her job at the time she conducted her counseling sessions with the victims, having been on the job less than a year.  But it is also true that she received training on how to conduct these sessions, and utilized materials to assist her with the interviews.  Further, she hasn't much changed the way in which she conducts her sessions.

One additional matter does give me pause, however.  Ms. Rupp testified that after each victim characterized touching "where you go potty" as unsafe, she then asked each victim to indicate who gave her that type of touch.  While Ms. Rupp did not agree, I am concerned that such a question may be dangerously leading.  Perhaps a better first question about touching, particularly unsafe touching, ought to be: Has anyone ever given you that type of touch?  If the answer is yes, then the follow up certainly ought to be to inquire who gave her that type of touch.  Ms. Rupp's question may well imply that someone has touched a child in that fashion, and the child is expected to name one or more persons, as both children did during that exercise.

Upon my questioning, Ms. Rupp defended the practice, stating she would expect the child to say "no one" if in fact no one had touched them in that fashion, and in fact she sometimes receives that response.  While I still have concerns about the practice and believe I have described the better practice, I am satisfied that Ms. Rupp's explanation is a good one and at any rate my concerns do not somehow fatally taint the children's admissions.  I conclude so in part because of the detail the children then provided, including the feelings of being "scared" and concerns that something bad would happen to their Uncle Ed if they disclosed the abuse.

On balance then, certainly the initial denials to the forensic interviewer were not uncommon and do not eviscerate the credibility of any subsequent disclosure by the victims.  Of far more interest and importance, then, are the circumstances under which the disclosures were eventually

made. Significantly, these were the first counseling sessions with Ms. Rupp, and therefore not likely to be tainted by the type of exercises which may taint the veracity or reliability of young victims' claims of abuse later in their counseling sessions.

The defense also expressed concern over the label "sicko," which both girls adopted to describe their uncle, the Defendant. But Ms. Rupp was clear that she did not hear that term until after the first session, and there is simply no evidence to suggest that family members of the victims somehow planted the idea or suggestion of improper physical touching by Mr. Kellogg. And while I have some concerns about the potential leading nature of Ms. Rupp's inquiry, the question, while not as open and restrained as I would like, does not poison the responses received when the totality of the circumstances are considered, including the detail provided by both victims of the circumstances surrounding the touching and their descriptions of circumstances which might have caused them to pause in making an earlier disclosure when asked.

Accordingly, I find the government has met its burden of proof by a preponderance of the evidence and instruct the Probation Officer to include the two-point enhancement pursuant to U.S.S.G. § 2G2.1(b)(2)(A). Further, I ask the parties to prepare to proceed accordingly, and to also be prepared to discuss the propriety of a reduction in the offense level for acceptance of responsibility at Mr. Kellogg's sentencing scheduled on March 3, 2016, at 10:30 a.m.

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge